# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**LOUIS P. CANNON,** *et al.***,**              )
                                        )
        **Plaintiffs,**                    )
                                        )
        **v.**                            )        **Civil Action No. 12-0133 (ESH)**
                                        )
**DISTRICT OF COLUMBIA,**                   )
                                        )
        **Defendant.**                     )
_____)

## MEMORANDUM OPINION

Plaintiffs purport to represent a class of retired police officers who were first employed by the District of Columbia ("District" or "defendant") before 1987 and were subsequently rehired by the District after 2004. After they retired, they received federal retirement benefits and, when they were rehired, they began receiving a salary from the District. When the District began reducing their pay by the amount of their pension payments, plaintiffs filed suit, alleging violations of the Fair Labor Standards Act, the First Amendment, their Fifth Amendment rights to due process, just compensation, and equal protection, and asserting multiple claims arising under District of Columbia law. Before the Court is the District's motion to dismiss or, in the alternative, for summary judgment and plaintiff's cross-motion for partial summary judgment. For the reasons set forth below, the Court will grant defendant's motion with respect to the federal claims, remand the remaining claims to Superior Court, and deny plaintiffs' motion or partial summary judgment.

## BACKGROUND

### I.    FACTS

Plaintiffs were first employed by the District as police officers before 1987.[1]  (First Am. Compl. ¶ 35; Def.'s Opp'n to Mot. for Temporary Restraining Order, Ex. 1 ("Toliver Decl.") ¶ 5.)  When they retired, they began receiving federal retirement benefits.  (*Id.*)  At various points after 2004, plaintiffs were rehired by the District to serve in the Department of General Services ("DGS") and, at that point, began receiving salaries from the District.  (*Id.* ¶ 4; First Am. Compl. ¶ 37.)  From the time that they were rehired until early 2012, plaintiffs received both their federal pension payments and their full salaries for the current positions as District employees.  (*See, e.g.,* Pls.' Opp'n to Def.'s Mot./Cross-Mot. for Summ. J. ("Pls.' Mot."), Ex. 5 ("Cannon Decl.") ¶ 19.)  The simultaneous receipt of federal pension and salary payments is commonly referred to as "double-dipping."

In summer 2011, the District began looking into the legality of double-dipping.  (Compl., Ex. 2, at 2.)  In fall 2011, it informed plaintiffs that it had mistakenly overpaid them for several years, since it had neglected to apply the offset set forth in D.C. Code § 5-723(e) to reduce their current paychecks by their pension payments.  (*See* Def.'s Partial Mot. to Dismiss or, in the Alternative, for Summ. J. ("Def.'s Mot."), Ex. 7 (letters to plaintiffs dated Oct. 12, 2011).)  In particular, the District notified them that although it would not recoup the thousands of dollars that it had erroneously paid in the past, it would rectify the error prospectively by offsetting their current salary payments by their monthly pension payments.  (*Id.*)

January 25, 2012 was the first date that plaintiffs' paychecks were reduced to reflect their pension payments.  (*See* First Am. Compl. ¶¶ 46, 50.)  One day later, plaintiffs filed suit, seeking

---

[1] The named plaintiffs are Louis P. Cannon, Stephen R. Watkins, Eric Westbrook Gainey, Gerald G. Neill, Sheila Ford-Haynes, and Harry Louis Weeks, Jr.

a temporary restraining order ("TRO") and preliminary injunction ("PI") to enjoin the offset and claiming that double-dipping was expressly permitted by a D.C. law enacted in 2004-- the D.C. Government Reemployed Annuitant Offset Elimination Amendment Act of 2004 ("Offset Elimination Act of 2004"), Act 15-489.  (*See* Compl. ¶ 32; Mot. for TRO at 6.)  At a hearing on January 31, 2012, plaintiffs' motion for a TRO was denied.

Plaintiff Cannon was fired on February 8, 2012, as Chief of the Protective Services Police Department because he allegedly failed to properly investigate an incident that occurred during an Occupy D.C. protest and subsequently submitted a false investigative report to the Director of DGS.   (Pls.' Mot. for Leave to File Suppl. Compl. ("Supp. Compl."), Ex. 3 ("Cannon Termination Letter"); Def.'s Opp'n to Pls.' Renewed Mot. for a Preliminary Injunction, Ex.1 ("D.C. Human Resources Decision Form").)  He was terminated at the conclusion of a Human Resources Department investigation that was initiated on October 26, 2011, and ended with General Counsel Charles Tucker's recommendation that Cannon be terminated.   (Def.'s Mot. for Leave to File a Sur-Reply ("Def.'s Renewed PI Sur-Reply"), Ex. 1 ("Tucker Decl.") ¶ 7.) Tucker's recommendation was made on January 17, 2012—one week before plaintiffs' paychecks were reduced by their pension payments and nine days before the instant suit was filed.  (*Id*.)

On February 10, 2012, some District employees, including several of the plaintiffs, did not receive their normal direct deposit salary payments.  (*See* Def.'s Opp'n to Pls.' Renewed Mot. for a PI, Ex. 2 ("Burrell Decl.") ¶ 6; Def.'s Renewed PI Sur-Reply, Ex. 2 ("Rivera Portis Decl.") ¶ 6.)  Due to a clerical error, they received paper checks instead.  (*Id*. ¶ 4.)  Employees of DGS called each plaintiff to explain what had happened and the plaintiffs were ultimately paid in full.  (Burrell Decl. ¶ 6.)

Plaintiffs subsequently amended their complaint to add claims based on these two events.[2]  (*See* Supp. Compl.)  They now assert claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), and under 42 U.S.C. § 1983 for the deprivation of due process, just compensation, and equal protection in violation of the Fifth Amendment and for retaliation in violation of the First Amendment.  In addition, plaintiffs assert multiple claims under District of Columbia common law,[3] the District of Columbia Self-Government and Governmental Reorganization Act, codified as amended at D.C. Code §§ 1-201.01 *et seq.*, and the District of Columbia Whistleblower Protection Act,  codified as amended at D.C. Code §§ 1-615.51 *et seq.* Defendant has moved to dismiss or, in the alternative, for summary judgment, on all claims and plaintiffs have cross-moved for partial summary judgment on their FLSA claims only.

## ANALYSIS

## I.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(1), plaintiffs must demonstrate that the court has jurisdiction.  *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  Since district courts are courts of limited jurisdiction, the inquiry into "subject matter jurisdiction is, of necessity, the first issue for an Article III court."  *Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004) (internal quotation marks omitted).  In "determining the question of jurisdiction, federal courts accept the factual allegations contained in the complaint as true . . . . Moreover, the Court can consider material outside of the pleadings when determining whether it has

---

[2] They again sought a preliminary injunction, which was denied.  (*See* Pls.' Renewed Mot. for a Preliminary Injunction.)

[3] The common law claims are: breach of contract; unjust enrichment; detrimental reliance/promissory estoppel; intentional or negligent misrepresentation; and defamation (Cannon only).

jurisdiction." *Halcomb v. Office of the Senate Sergeant-At-Arms*, 563 F. Supp. 2d 228, 235

(D.D.C. 2008).

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft

v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

This facial plausibility standard "asks for more than a sheer possibility that a defendant has acted

unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 556). "[A] complaint [does not] suffice if it

tenders 'naked assertions' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550

U.S. at 557) (some alteration marks omitted).

Under Rule 56, summary judgment should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986).  There is a "genuine

issue" of material fact if a "reasonable jury could return a verdict for the nonmoving party."

*Galvin v. Eli Lilly & Co*., 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at

248).  A moving party is thus entitled to summary judgment against "a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Waterhouse v. Dist. of Columbia*, 298

F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

While "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor, *Anderson*, 477 U.S. at 255, the non-moving party "may not rest upon the mere on allegations or denials of his pleading." *Id*. at 298.

## II.     FAIR LABOR STANDARDS ACT

Plaintiffs Ford-Haynes, Neill, and Weeks assert claims under the FLSA, arguing that they are being paid less than the minimum wage mandated by the FLSA since their paychecks have been reduced by the offset.  (First Am. Compl. ¶¶ 56-61.)

Under the FLSA, employers must pay employees at least $7.25 per hour, plus time-and-a-half for overtime work.  29 U.S.C. §§ 206, 207.  Exempt from the FLSA's overtime and minimum wage requirements are those "employed in a bona fide executive, administrative, or professional capacity . . . ."  29 U.S.C. § 213(a)(1).  To qualify as an exempt "executive" or "administrative" employee, the person must be "[c]ompensated on a salary basis at a rate of not less than $455 per week."  29 C.F.R. §§ 541.100, 541.200. [4]  This is consistent with the FLSA's

---

[4] In addition, to qualify as an exempt "executive," the employee must also be one

> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*Id*. § 541.100.  Similarly, an exempt "administrative" employee is one

> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

goal of "protect[ing] low paid rank and file employees" since "[h]igher earning employees . . . are more likely to be bona fide managerial employees." *Darveau v. Detecon, Inc*., 515 F.3d 334, 338 (4th Cir. 2008) (quoting *Counts v. S.C. Elec. & Gas Co*., 317 F.3d 453, 456 (4th Cir. 2003)).

The District argues that Ford-Haynes, Neill, and Weeks are exempt from the FLSA because they are high-level, managerial employees.  (*See* Def.'s Mot. at 22-25 (arguing that Neill and Weeks are exempt as "executive" employees); Def.'s Combined Reply/Opposition (Def.'s Reply") at 18-22 (arguing that Ford-Haynes is exempt as an "administrative" employee).) Plaintiffs do not dispute that they perform the management-related duties described in 29 C.F.R. §§ 541.100(2)-(4), 541.200(2)-(3), but they argue that they do not qualify for the FLSA exemption because they earn less than $455 per week.  (*See* Pls.' Reply at 9-10.)   Therefore, the sole dispute between parties is whether plaintiffs Ford-Haynes, Neill, and Weeks are "[c]ompensated on a salary basis at a rate of not less than $455 per week."  29 C.F.R. §§ 541.100, 541.200.

Ford-Haynes receives $1,739.71 gross per week for full-time work.  She earns $43.50 per hour—a salary of $90,474.00 annually—as a Management Analyst employed by the District. (*See* Pls.' Reply, Ex. 4.)  From her rehire in July 2011 until January 2012, she also received approximately $72,000 per year—$6,000 per month— in pension payments.  (*Id*.)  Since January 25, 2012, her District paychecks have been offset by her pension payments, so she now receives $239.88 gross per week from the District (Answer ¶ 59; Pl.'s Mot., Ex. 2 (Pls.' Stmt.) ¶ 5) and $1,500.00 per week from her pension.  (Pls.' Reply, Ex. 4.)

Neill receives approximately $1,897.71 gross per week for full-time work.  He earns $40.48 per hour—a salary of $84,202.00 annually—as a District employee.  (*See* Pls.' Mot., Ex.

---

*Id*. § 541.200.

8.)   From his rehire in 2009 until January 2012, he also received $77,724.96 per year—

$6,477.08 per month— in pension payments.   Since January 25, 2012, his District paychecks

have been offset by his pension payments and now he receives $278.44 gross per week in his

paycheck (Pls.' Stmt. ¶ 4) and $1,619.27 per week from his pension.  (Pls.' Mot., Ex. 8 at 3.)

Weeks receives at least $883.52 per week for full-time work.  He earns $22.09 per

hour— a salary of $45,943.00 annually—as a Supervisory Protective Services Officer for the

District.  (*See* Pls.' Mot., Ex. 9 at 2-3.)  From March 2010 until January 2012, he also received

$42,408.96 per year—$3,534.08 per month— in pension payments.  (*See id.* at 4-5.)  Since

January 25, 2012, his District paychecks have been offset by his pension payments, so he now

receives $0 per week in his paycheck and $883.52 per week from his pension.  (*Id.*)

It is therefore undisputed that each of these plaintiffs receives a total of more than $455

per week.  However, the parties disagree about whether the federal pension payments should be

included in the calculation of the minimum "salary basis" necessary to be exempt from the

FLSA.  The District calculates the relevant "salary basis" as the amount that plaintiffs would

receive before the offset is applied.  (*See* Def.'s Mot. at 23.)  Plaintiffs urge a narrower

interpretation, insisting that the FLSA "salary basis" refers to the amount of their paychecks after

they have been reduced to account for their pension payments.  (*See* Pls.' Mot. at 14).

Plaintiffs, however, offer no authority for the proposition that the Court should ignore the

thousands of dollars in pension payments that they receive each month and look only at the

money that they receive from their current paychecks.  Nor can the Court find any.  Rather, the

Department of Labor's related administrative interpretations, *see, e.g.*, Administrator's Op.

Letter, FLSA 2006-43 (Dep't of Labor Nov. 26, 2006),[5] and the relevant case law support

defendant's interpretation of the FLSA.  *See Fed. Air Marshals v. United States*, 84 Fed. Cl.

585, 596-97 (2008) (explaining that, although the pilots' "Availability Pay" was not hourly

compensation under the FLSA, the pilots were not entitled to a "windfall" and therefore it was

properly deducted from their regular pay); *see also Rogers v. Dist. Unemployment Compensation

Bd.*, 290 A.2d 586, 587 (D.C. 1972) ("[P]etitioner's annuity is deductible from his

unemployment benefits because his employer contributed to it.").

     Although plaintiffs correctly argue that the Court should focus on the pay that the

employee actually receives, *see Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 848

(6th Cir. 2012), they ignore the fact that they receive compensation far in excess of the FLSA

threshold.[6]  Moreover, plaintiffs in fact control whether their earnings come through their

---

[5] The Department of Labor explained that, for compensation to qualify as "free and clear" payment on a "salary basis,"

> it is immaterial what specific terms . . . an employer uses when compensating employees on a fee or commission basis. What matters is that the employee receives no less than the weekly-required amount as a guaranteed salary constituting all or part of total compensation, which amount is not subject to reduction due to the quality or quantity of the work performed, and that the employee is never required to repay any portion of that salary even if the employee fails to earn sufficient commissions or fees.

*Id.*

[6] An employee is considered to be paid "on a salary basis" if he receives a set amount of compensation that is not, as a general rule, subject to reduction.  29 C.F.R. § 541.602(a).  There are a few permissible types of deductions set forth in the regulations*, see id.* § 541.602(b), and plaintiffs argue that the offset is unlawful because it is not one of those deductions.  (Pls.' Mot. at 13-14.)  However, § 541.602(b) is irrelevant to the offset at issue because it relates to deductions from the salary payment which are based upon employee absence or disciplinary penalties.  The permissible deductions listed in § 541.602(b) are different because they reduce the total compensation amount.  Plaintiffs, by contrast, continue to be compensated at their regular rates which are "not subject to reduction because of variations in the quality or quantity of the work performed."  *Id*. § 541.602(a).

paycheck or their pension checks because, as the October 12, 2011 letters explain, plaintiffs may elect to receive their full salary in their paychecks and suspend the annuity payments instead. (Def.'s Mot., Ex. 7 at 3.)   Regardless of whether it comes in their paychecks or in their pension checks, they earn *and* receive between $22.09 and $43.50 per hour, which far exceeds the cut-off for coverage under the FLSA.

Therefore, since Ford-Haynes, Neill, and Weeks meet the FLSA exemption's threshold salary requirement, and it is undisputed that they qualify as exempt executive or administrative employees, their FLSA claims fail matter of law.

## III.    DEPRIVATION OF PROPERTY INTEREST

Plaintiffs also claim that they were deprived of "pay accrued to them" without due process or just compensation in violation of the Fifth Amendment.  (First. Am. Compl. ¶¶ 51-53.)

Under the Due Process Clause, the government must provide "notice, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Jones v. Flowers*, 547 U.S. 220, 226 (2006).[7]  Beyond these threshold requirements, the extent of procedural protections "varies with the particular situation" and the interest at stake.  *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  In *Mathews v. Eldridge*, the Supreme Court articulated the three factors that govern the extent of procedural protections that are required:

> [f]irst, the private interest that will be affected by the official
> action; second, the risk of an erroneous deprivation of such interest

---

[7] The Due Process Clause provides that "no person shall be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "The procedural due process guarantee imposes procedural requirements on the government before it deprives individuals of protected interests."  *Pearson v. Dist. of Columbia*, 644 F. Supp. 2d  23, 46 (D.D.C. 2009) (quotation marks omitted).

> through the procedures used, and the probable value, if any, of
> additional or substitute procedural safeguards; and finally, the
> Government's interest, including the function involved and the
> fiscal and administrative burdens that the additional or substitute
> procedural requirement would entail.

424 U.S. 319, 335 (1976).

Plaintiffs first claim that they were deprived of procedural due process when their paychecks were reduced because they were not given a pre-deprivation forum to challenge the offset. (Pls.' Mot. at 21-23; Pls.' Reply at 10.)  However, this claim fails because plaintiffs were provided all that due process requires (*i.e.*, notice and a forum to challenge the impending offset), but they neglected to avail themselves of it.  (    Def.'s Mot. at 15-17.)

As an initial matter, plaintiffs received notice of the offset months before it became effective.  They were individually informed of the impending offset through letters dated October 12, 2011, and told to contact the Deputy General Counsel of Human Resources, Dwayne Toliver, with any questions.  (Def.'s Mot., Ex. 7.)  However, they failed to do so.[8]  Instead, plaintiffs waited until the offset was applied to their paychecks and raised the issue by filing for emergency relief in federal court.

More importantly, plaintiffs had an opportunity to challenge the offset, but ignored the procedures that exist to resolve this type of dispute.  (*See* Def.'s Mot. at 15-17.)  Pursuant to the Comprehensive Merit Protection Act ("CMPA"), D.C. Code § 1-603.01 *et seq.*, District personnel disputes are resolved through local procedures that provide for "prompt handling . . . . [and the] expeditious adjustment of [employee] grievances and complaints."  D.C. Code § 1-616.53(a).  As the D.C. Court of Appeals recently explained, this process "provide[s] 'the

---

[8] Plaintiff Cannon states that he called Shawn Stokes, the Director of Human Resources and told her that the offset was inapplicable and that he "understood . . . that the letters regarding the offset had been issued in error" (Cannon Decl. ¶ 20),  but does not explain what, if any, response he was given.

exclusive remedy for a District of Columbia public employee who has a work-related complaint *of any kind*.'" *Lattisaw v. Dist. of Columbia*, 905 A.2d 790, 794 (D.C. 2006) (quoting *Robinson v. Dist. of Columbia*, 748 A.2d 409, 411 (D.C. 2000)) (emphasis added).

Plaintiffs' only response is that the CMPA does not apply to them, but that argument is factually and legally flawed. The single authority on which they rely—D.C. Code § 1-207.13(d) (*see* Pls.' Reply at 10)—is inapposite, since that provision does not relate to the CMPA and, in any case, applies to individuals employed by the federal government before the District established its own personnel system in 1979. D.C. Code § 1-207.13(d); *see Dist. of Columbia v. Hunt*, 520 A.2d 300, 302 (D.C. 1987). It is therefore irrelevant to the plaintiffs, all of whom were hired by the District after 2004, and, as a result, their complaints are covered by the CMPA grievance process. *See Lattisaw*, 905 A.2d at 793. ("[F]or the purpose of determining the CMPA's applicability, our case law has emphasized that 'grievances' are to be broadly construed.")

Plaintiffs, having chosen not to avail themselves of the available process (*see* 6 DMCR § 1636 (providing for initiation of process by filing a written grievance)), cannot now complain that they did not have the opportunity "to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333; *English v. Dist. of Columbia*, 815 F.Supp.2d 254, 267 (D.D.C. 2011) ("If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.") (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Thus, their allegations that "[d]efendant has never provided any meaningful means for . . . respond[ing] to [the offset] and [p]laintiffs were given no pre-deprivation forum to assert their defenses against it" (Pls.' Mot. at 22) are simply wrong.

Nor can plaintiffs argue that greater procedural protection was warranted under *Mathews*. First, they have not demonstrated that the risk to their private interests is great.  Even if the offsets were arguably improper, plaintiffs would risk only temporary deprivation of the offset amounts.  Meanwhile, they would continue to receive their full federal pensions—thousands of dollars per month—in addition to partial salary payments (except for Weeks).  Moreover, their own actions suggest that the effect on their personal finances is not dire; even with notice of the impending offset, they did not challenge the application of the offset or restructure their personal finances to account for the reduction in their income.  (*See* Tr. TRO Hearing at 60, Jan 31, 2012.) Second, there is a low risk of error here where the District's decision is based on statutory interpretation and does not require a factual determination.  Finally, the District has a significant interest in ensuring that its employees address personnel matters through the prescribed grievance process.  Therefore, there can be no basis for plaintiffs to argue that their procedural due process rights were violated.  *See Lattisaw*, 905 A.2d at 793; *see also Deschamps v. Dist. of Columbia*, 582 F. Supp. 2d 14, 17 (D.D.C. 2008) (explaining that the CMPA "provides all the process [plaintiff] is entitled to").

In addition, plaintiffs contend that the offset constitutes a "taking" under the Fifth Amendment (First Am. Compl. ¶ 52), which prohibits taking "private property . . . for public use, without just compensation."  U.S. Const. amend. V.   This claim fails as well.

Plaintiffs appear to have "confuse[d] a property right cognizable under the Takings Clause of the Fifth Amendment with a due process right to payment of a monetary entitlement under a compensation statute."  *Adams v. United States*, 391 F.3d 1212, 1220 (Fed. Cir. 2004),

*aff'g* No. 00-447 C, 2003 U.S. Claims LEXIS 238 (Aug. 11, 2003).[9]  In *Adams*, Judge Block

rejected a similar claim for unpaid overtime wages, explaining that

> [t]his is either a standard claim for money . . . or a due process
> claim . . . . However, it is not a Takings Claim under the Fifth
> Amendment, for even if an obligation to pay money can be
> considered property, no property was here seized for public use. In
> other words, nothing was really 'taken' from plaintiffs for the
> [benefit] of the public - at best, [wages] simply were not paid.
> Accordingly, the government did not appropriate plaintiffs' money
> for its own purpose. Instead, it simply did not pay plaintiffs . . .
> overtime because it believed plaintiffs' [sic] exempt . . . .

2003 U.S. Claims LEXIS 238, at *29-30.  Furthermore, this Circuit has recently explained that,

if the proceeding by which property is transferred from an individual to the government does not

violate due process, then "'[t]he government may not be required to compensate an owner for

property which it has already lawfully acquired under the exercise of governmental authority

other than the power of eminent domain.'"  *Tate v. Dist.of Columbia*, 627 F.3d 904, 909 (D.C.

Cir. 2010) (quoting *Bennis v. Michigan*, 516 U.S. 442, 452 (1996)).  Since the Court has already

found that the procedures by which the District imposed the offset did not violate due process, its

action did not "constitute a taking without compensation violative of the Fifth Amendment."  *See*

*Tate*,  627 F.3d at 909-10; *Fox v. Dist. of Columbia*, No. 10-2118, 2012 U.S. Dist. LEXIS 44141,

at *33-34 & n.17 (D.D.C. Mar. 30, 2012).

Therefore, plaintiffs' claims in Count I, based on the deprivation of a property interest,

are dismissed.

---

[9] Although the Court of Appeals for the District of Columbia left open the question of whether a
FLSA claim could provide the basis for a Takings Claim in *Adams v. Hinchman*, 154 F.3d 420,
425-26 (D.C. Cir. 1998), the Federal Circuit's resolution of that case provides persuasive
authority here.

IV.    **EQUAL PROTECTION**

Plaintiffs also claim that they were discriminated against in violation of their Fifth Amendment right to equal protection.  They argue that defendant "enforced this offset against the [p]laintiffs . . . but [has] effectively negat[ed] the effect of the offset on other persons by simply giving them more money."  (First Am. Compl. ¶¶ 64, 77.)[10]  In effect, plaintiffs challenge the fact that the District gave raises to some District employees, but not to them.  The District has moved to dismiss this count for failure to state a claim.  (*See* Def.'s Mot. at 17-22.)

First, to establish an equal protection claim, plaintiffs must show that they were singled out and treated differently from others who were similarly situated.  *Women Prisoners of D.C. Dep't of Corrs. v. Dist. of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996).  To meet this burden, plaintiffs allege that they were treated differently from District police officers who were given a raise to compensate for the income reduction resulting from the offset.  (*See* Pls.' Mot. at 15 (relying upon Compl., Ex. 2 (*Washington City Paper* article discussing raises given to Metropolitan Police Department ("MPD") employees Hickson, Major, and Sarvis)).)  However, these officers are not similarly situated.  First, they are employed by a different agency within the District government—the MPD (*see* Compl., Ex. 2)—whereas plaintiffs work for the Department of Protective Services, which is a division of DGS.  (Toliver Decl. ¶ 4; *see also* Tr. TRO Hearing at 25, Jan 31, 2012 (explaining that plaintiffs "do not perform the ordinary street patrol duties and primary criminal response to the general public that the Metropolitan Police Department

---

[10] At various points, plaintiffs make the conflicting assertion that they are challenging the application of the offset and not the recent raises.  (*See, e.g.*, Pls.' Mot. at 16; Pls.' Reply at 14.)  However, the offset has also been applied to the MPD officers (*see* Compl., Ex. 2 at 3), as plaintiffs recognize (First Am. Compl. ¶¶ 48, 64, 68, 72, 76) , so they cannot claim that the offset itself has been discriminatorily applied.  Thus the Court must interpret the claim as set forth in the complaint and conclude that the challenge is to the salary increases that "offset the offset." (*Id*; *see also* Pls.' Mot. at 19 ("What [plaintiffs] properly complain of is that [defendant] gave these reemployed federal annuitants *additional* money . . . solely to offset the offset . . . .").)

does.").)  Second, as plaintiffs appear to concede (Pls.' Mot. at 18-19), the MPD officers are not similar to plaintiffs in terms of responsibilities, background, or experience.

Given these differences, the Court cannot agree with plaintiffs' contention that the single way in which the MPD officers and plaintiffs *are* similar—that they are both subject to the offset—means that "all of the relevant aspects of [their] employment were 'nearly identical' to those of  [the MPD officers]."  *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008) (internal quotation omitted); *see Noble v. U.S. Parole Comm'n*, 194 F.3d 152,155 (D.C. Cir. 1999) (finding "groundless" the plaintiff's contention that there exists "a constitutional right to equal treatment under the law by the government, even where that treatment is imposed by two different agencies"); s*ee also Vandermark v. City of New York*, 391 Fed. Appx. 957, 959 (2d Cir. 2010) ("There are numerous reasonable bases on which the City of New York might decide that NYPD officers and [Environmental Police Officers] should receive different compensation and benefits, including the danger associated with the positions, [and] the physical strain of the job . . . .");  *Tumminello v. United States*, 14 Cl. Ct. 693, 697 (1988) ("[F]actual distinctions between employees in different categories and in different federal agencies preclud[ed] a finding that they are all similarly situated. . . .").

Second, even if plaintiffs could be considered to be similarly situated to the MPD officers, which they cannot, their equal protection claim would still fail because they have not shown that the District's action was irrational.  *See Brandon v. Dist. of Columbia Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987) ("[T]he government may avoid violating equal protection principles if it can demonstrate that its reasons for treating an individual differently bear some rational relationship to a legitimate state purpose.").   Since plaintiffs concede that they are not part of a suspect class (Pls.' Mot. at 16), the only question is whether the District's action can be

considered a reasonable way of addressing the underlying concern. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83-84 (2000); *Heller v. Doe*, 509 U.S. 312, 319-20 (1993). Under this standard, "[t]he government . . . has no obligation to produce evidence to sustain the rationality of [its determination]; instead , . . . [t]he burden is on the one attacking the [governmental] arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Tate*, 627 F.3d at 910 (internal quotation marks omitted).

Plaintiffs' claim also fails because it does not violate equal protection to give raises to some employees and not to other ones. As the Supreme Court has made clear, "[t]o treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605 (2008) ("[W]e have never found the Equal Protection Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner.") Therefore, even if the District did raise the MPD officers' pay to offset the offset, that would not raise equal protection concerns.

Moreover, as numerous courts have recognized, the decision to apply the offset to plaintiffs' salaries is rationally related to legitimate government interests. *See, e.g.*, *Haworth v. Office of Personnel Mgmt.*, 112 Fed. Appx. 406, 408 (6th Cir. 2004) ("[T]he purpose of [5 U.S.C.] § 8344(a) is to prevent retired federal employees from 'double-dipping,' *i.e.*, receiving full retirement benefits and full regular wages at the same time. Protecting the public fisc by enacting laws against double-dipping by retired employees is a rational legislative decision."); *Connolly v. McCall*, 254 F.3d 36, 43 (2d Cir. 2001) ("The default policy of preventing receipt of a public pension while also receiving a public salary reflects the notion that such simultaneous

income streams could constitute an abuse of the public fisc . . . . [W]hether sound policy or not, there is nothing irrational about [it].") (internal quotation marks omitted).

Ultimately, plaintiffs have not stated a claim because equal protection "does not require [that] all persons everywhere be treated alike,"[11] but instead only prohibits the government from "treat[ing] *similarly situated* individuals differently without a rational basis." *Noble*, 194 F.3d at 154 (emphasis in original).

## V.    FIRST AMENDMENT

Plaintiffs bring two claims under the First Amendment, alleging that defendant violated their right to petition the government by retaliating against them after they initiated the instant lawsuit.  (Supp. Compl. ¶¶ 13-24.)  Specifically, they contend that Cannon's termination and plaintiffs' receipt of paper paychecks rather than direct deposit payments were acts of retaliation designed to intimidate plaintiffs and members of the proposed plaintiff class from challenging the offset.  (*Id.*)

Because plaintiffs are public employees, their speech warrants "considerable, but not unlimited, First Amendment protection."  *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007).  Therefore, their claims of retaliation are governed by a four-factor test:

> First, the public employee must have spoken as a citizen on a matter of public concern.  Second, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Third, the employee must show that her speech was a substantial or motivating factor in prompting the retaliatory

---

[11] Contrary to plaintiffs' contention (Pls.' Mot. at 15-21), they are not entitled to discovery on this point because they have not provided any basis to believe that they are similarly situated to the MPD officers who received a raise.  *See Dunning v. Quander*, 508 F.3d 8, 10 (D.C. Cir. 2007) (denying discovery under Rule 56(f) because "[w]ithout some reason to question the veracity of affiants, . . . [plaintiff]'s desire to test and elaborate affiants' testimony falls short.") (alterations in original) (internal quotation marks omitted).

> or punitive act. Finally, the employee must refute the government
> employer's showing, if made, that it would have reached the same
> decision in the absence of the protected speech.

*Id.* (internal quotation marks and citations omitted).  In addition, to be actionable, the

government's action must be "likely to deter a person of ordinary firmness from th[e] exercise

[of protected activity]."  *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir.

2002) (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996)).

### A.     Cannon's Termination

The first claim under the First Amendment, which is based on Cannon's termination, is

deficient in several respects.  (*See* Supp. Compl. ¶¶ 6-10, 13-18.)   However, it is unnecessary to

address defendant's multiple grounds for dismissal because Cannon cannot establish causation,

for he cannot show that the initiation of the instant suit "was a substantial or motivating factor in

prompting [his firing]."  *Wilburn*, 480 F.3d at 1149; *see Velikonja v. Mueller*, 362 F. Supp. 2d 1,

24 (D.D.C. 2004) ("Plaintiff fails to offer evidence to suggest a link between the government's

conduct and [this lawsuit]; thus, the Court need not consider whether his [initiation of this suit]

was constitutionally protected."), *aff'd*, 466 F.3d 122, 124 (D.C. Cir. 2006).

With respect to causation, Cannon relies solely upon the short temporal proximity

between the filing of the lawsuit and his letter of termination.  (Supp. Compl. ¶¶ 6-10, 13-18; *see*

Pls.' Mot. at 29-30.)  This asserted causal link, however, is inconsistent with the facts.

According to the termination letter, Cannon was fired for his failure to adequately investigate an

October 26, 2011 incident involving Occupy D.C. and for generating a report containing false

information that he submitted to his superiors within DGS.  (Cannon Termination Letter at 1.)

The evidence makes clear that the disciplinary action that resulted in his firing was undertaken

months before the lawsuit was filed or even contemplated (*id*), and the recommendation that he

be fired, dated January 17, 2012, was also made well before there was any reason for litigation.

(D.C. Human Resources Decision Form.)  On that date, Charles Tucker, General Counsel for the

Department of Human Resources, formally recommended that Cannon, as well as another

individual, be fired for the reasons stated in the termination letter.  (*Id*.)  Tucker's

recommendation was approved on January 18, 2011 (*id*.), which was over a week before

plaintiffs filed their initial complaint.  Thus, as plaintiffs concede, when the District made the

decision to fire Cannon, it had no reason to retaliate against him.  (*See* Tr. Second PI Hearing at

15, Mar. 5, 2012 (plaintiffs' attorney agreeing that "[t]he District would not have known— the

folks of HR would not have known about the lawsuit, because the cause of the lawsuit didn't

occur until January 25th.").)

 In the alternative, plaintiff's claim of retaliation cannot survive because he has not

rebutted the District's legitimate—and well substantiated—reason for its decision.

 In an attempt to refute defendant's explanation, Cannon argues that, even if the

allegations against him were true, termination was such a disproportionate penalty for the offense

that retaliation must be inferred.  (*See* Pls.' Mot. at 19; Pl.'s Mot., Ex. 3 (Pls.' Stmt. in Response

to Def.'s Stmt.) at 7-10.)[12]  In his view, the penalty cannot be legitimate because it is inconsistent

the District's other disciplinary policies.  (*Id*.)

 However, the policy that Cannon cites does not even apply to him since he was an "at

will" employee who occupied a high-level position within DGS and was found to have

committed a breach of trust.  (*See* Pls.' Mot., Ex. 4 at 48 (progressive discipline policy applicable

---

[12] Plaintiffs' unfounded allegations that defendant's attorneys fabricated evidence of the decision
to terminate Cannon (*see, e.g.*,  Reply in Support of Renewed Mot. for a Preliminary Injunction
at 4 n.3 ("[The Human Resources Decision Form] is entirely a backdated fabrication and a fraud
upon this Court"); Tr. Second PI Hearing, at 15, 17-18, Mar. 5, 2012; Pls.' Mot. at 29 n. 11),
have already been rejected by the Court.  (*See* Tr. Second PI Hearing at 15, Mar. 5, 2012.)

only to "Career Service" employees who have completed their probationary period); *id.*, Ex. 5 at

1 (penalty table applicable only to MPD officers).)

Ultimately, defendant has shown that it not only "would have reached the same decision

in the absence of protected speech," *Wilburn*, 480 F.3d at 1149, but also that it *did* reach that

decision before the arguably protected activity occurred.  Therefore, Cannon's claim of

retaliation will be dismissed.

### B.      Issuance of Paper Checks

Plaintiffs' second claim of retaliation, which is based on the District's issuance of paper,

rather than electronic, paychecks is also seriously flawed.   First, it is not cognizable under the

First Amendment because it would not deter a person of ordinary firmness from exercising his or

her rights.  Second, plaintiffs have again failed to establish causation.

"The widely accepted standard for assessing whether 'harassment for exercising the right

of free speech [is] … actionable'. . . depends on whether the harassment is '[]likely to deter a

person of ordinary firmness from that exercise.'" *Toolasprashad*, 286 F.3d at 585 (quoting

*Crawford-El*, 93 F.3d at 826) (alternations in original).   The Circuit has explained that, in the

employment context, the action taken against an employee need not be as significant as the

denial of a promotion and may be satisfied by acts such as the refusal to consider someone for a

new position within a department, a two-day suspension, or the transfer of a teacher to another

school.  *See Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (describing case law and finding

that requiring submission of new materials that necessitated twenty-seven hours of additional

work could deter a person of ordinary firmness); *accord Crawford-El*, 93 F.3d at 826 (small

pecuniary losses could deter a prisoner of ordinary firmness); *Baumann v. D.C.*, 744 F. Supp. 2d

216, 223 (D.D.C. 2010) (planting police monitors to "monitor" speech could deter a person of

ordinary firmness); *Banks v. York*, 515 F. Supp. 2d 89, 111-12 (D.D.C. 2007) (placing prisoner

in solitary confinement could deter a person of ordinary firmness); *Anderson-Bey v. Dist. of Columbia*, 466 F. Supp. 2d 51, 65 (D.D.C. 2006) (imposition of restraints and denial of food and water could deter a person of ordinary firmness).  By contrast, coercing a colleague into withdrawing as a co-presenter has been found to be insufficient to sustain a First Amendment retaliation claim.  *Krieger v. United States Dep't of Justice*, 529 F. Supp. 2d 29, 57-58 (D.D.C. 2008)

Under this standard, plaintiffs' claims are not cognizable because receiving a single paycheck in the form of a paper check, rather than by direct deposit, would not deter a person of ordinary firmness from exercising his First Amendment rights.  Indeed the plaintiffs' receipt of paper rather than electronic paychecks has not dampened their zeal for litigation since they responded to this incident by filing a supplemental complaint, renewing their motion for a preliminary injunction, and filing a cross-motion for summary judgment.  *See Hatfill v. Ashcroft*, 404 F. Supp. 2d 104, 119 (D.D.C. 2005) ("[W]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech.") (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *see also Krieger*, 529 F. Supp. 2d at 57-58 (dismissing retaliation claim alleging that employer sought to impede the plaintiff's speaking engagement where the plaintiff nevertheless participated in the engagement as scheduled).

Furthermore, plaintiffs have not rebutted defendant's explanation that the issuance of paper checks was the result of a clerical error.  (*See* Burrell Decl. ¶ 6; Rivera Portis Decl. ¶ 6.) Scott Burrell, the Chief Operating Officer of DGS, who is responsible for overseeing the Human Resources Division, has explained that "the Office of Payroll and Retirement Services made a mistake and plaintiffs were issued 'live,' paper checks, instead of direct deposits."  (Burrell Decl.

¶ 6.)  Plaintiffs baldly assert that this mistake only affected plaintiffs (*see* Pls.' Reply to Pls.'

Renewed Mot. for a PI at 7), but that is not true.  At least one District employee (another

reemployed federal annuitant) who is not a plaintiff was affected by this same error (Rivera

Portis Decl. ¶ 6), which lends further credibility to defendant's explanation.  Moreover,

defendant contacted all of the affected employees and explained the problem, which has not

occurred again.  (*See id*; Burrell Decl. ¶ 6.)  Ultimately, there is *no* indication that retaliation had

anything to do with this clerical error.

## VI.  SUPPLEMENTAL JURISDICTION

Since all of the federal claims are being dismissed, the Court will decline to exercise

supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(c)(3).  *See*

*Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423-24 (D.C. Cir. 2005) (if "all federal-law claims are

dismissed before trial, the balance of factors to be considered under the pendent jurisdiction

doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to

exercise jurisdiction over the remaining state-law claims") (quoting *Carnegie-Mellon Univ. v.*

*Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Remand to Superior Court is particularly appropriate here because plaintiffs' remaining

claims raise novel and complex issue[s] of [District] law."  28 U.S.C. § 1367(c)(1).  Their core

challenge to the offset requires interpretation of D.C. Code § 1-611.03(b), as amended by the

D.C. Government Reemployed Annuitant Offset Elimination Amendment Act of 2004, Act 15-

489)) and § 5-723(e), which is best resolved in the first instance by the local courts.  *Barnes v.*

*Dist. of Columbia*, 611 F. Supp. 130, 136 (D.D.C. 1985) ("The plaintiffs' claims under the D.C.

Code and the personnel manual involve unexplored questions of state law which are best left to

the local courts.  In this situation, 'a federal District Court opinion is no substitute for an

authoritative decision by the courts of the District of Columbia.'") (quoting *Doe v. Bd. on Prof'l*

*Responsibility of the D.C. Court of Appeals*, 717 F.2d 1424, 1428 (D.C. Cir. 1983)).  Similarly,

their claims of retaliation under the D.C. Whistleblower Protection Act, D.C. Code § 1-

615.53(a), delve into an undeveloped body of law which is also more suitable for elaboration by

the local courts.  *See Lowe v. Dist. of Columbia*, 669 F. Supp. 2d 18, 31-32 (D.D.C. 2009)

(remand of Whistleblower Protection Act claims is especially appropriate given the undeveloped

state of the law); *see also Terrell v. Dist. of Columbia*, 703 F. Supp. 2d 17, 23 (D.D.C. 2010)

(same); *Pearson v. Dist. of Columbia*, 644 F. Supp. 2d 23, 49-50 (D.D.C. 2009) (same).

Although plaintiffs insist that this Court has exclusive jurisdiction over this case pursuant

to D.C. Code § 1- 815.02(a) (*see* Pls.' Reply at 10; First Am. Compl. ¶ 7), they have misread that

statute.  This provision of Chapter 8 of the D.C. Code ("District of Columbia Retirement Funds")

provides that the district court shall have exclusive jurisdiction over cases related to the payment

of federal pensions.  *See* D.C. Code § 1-815.02(a) (providing jurisdiction only for actions arising

under Chapter 8).  However, plaintiffs make no claim regarding their pensions, nor could they,

since their pensions have not been affected.  Rather, they contest the fact that their salary is being

reduced by their pension payments.   *See Barnes*, 611 F. Supp. at 136 (explaining that the offsets

did not reduce the plaintiffs' federal pensions but rather affected their local salaries).  Therefore,

D.C. Code § 1-815.02(a) is irrelevant.

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion to dismiss or, in the

alternative for summary judgment, with respect to plaintiffs' claims under the FLSA, the Fifth

Amendment (due process, just compensation, and equal protection), and the First Amendment,

remands the remaining claims to Superior Court, and denies plaintiffs' cross-motion for partial

summary judgment.  A separate order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   July 6, 2012